[Civ. No. 1332. Third Appellate District.—September 7, 1915.]

## THERESA STOHLMAN, Respondent, v. R. W. MARTIN, Appellant.

Public Highways—Travel Upon—Duty to Keep to Right—Construction of Statute.—By the provisions of section 4, subdivision 1, of the act of 1907, amending certain sections of "An act to regulate the operation of motor vehicles on public highways," etc., (Stats. 1907, pp. 916–17), and of section 3, subdivision 3 of such act, the legislature intended to make it the duty of persons using such highways to keep to the right side thereof at all times, when possible to do so, regardless of whether they should actually meet or see any other person travelling on such highway in an opposite direction.

Id.—Driving on Wrong Side—Act not Necessarily Negligent.—The fact, however, that the driver of a motor vehicle might violate the statute by driving on the wrong side of the road is not of itself necessarily an act of negligence in all cases, as he might for a sufficient reason be compelled so to do in such manner as to leave room for approaching vehicles to pass with perfect safety, in which case, if damage occurred by collision, the question as to whose negligence was directly responsible therefor would depend for its solution upon the other circumstances attending the accident.

Id.—Negligence—Personal Injuries—Findings Conclusive.—In this action for damages for personal injuries sustained by the plaintiff while driving along a public highway from being struck by an automobile proceeding in the opposite direction and on the wrong side of the highway, it is held that it was for the trial court, acting as a jury, to determine from the evidence whether the proximate cause of the plaintiff's injuries was in the act of the defendant in wrong-

fully driving his car on the left hand side of the road, and that its determination of that question in the affirmative is not open to review under the evidence.

ID.—PLEADING—AMENDMENT OF COMPLAINT—INCREASED CLAIM FOR COMPENSATORY RELIEF—ABSENCE OF ERROR.—An order allowing the plaintiff to amend her complaint during the progress of the trial and before she rested her case, by alleging the incurring of an amount for doctor's bill in excess of that stated in the original complaint and alleging an increased amount for damages, does not involve matters arising subsequently to the filing of the original complaint which should have been set out by way of supplemental complaint, but merely called for a larger quantum of compensatory relief, and there is no error in allowing such an amendment.

APPEAL from a judgment of the Superior Court of Yuba County and from an order denying a motion for a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

Wetmore & Davies, for Appellant.

W. H. Carlin, for Respondent.

HART, J.—This is an action for personal injuries alleged to have been negligently inflicted upon the plaintiff by the defendant. The action was tried by the court, a trial by jury having been waived by both parties.

The court found in favor of the plaintiff and awarded her damages in the sum of one thousand dollars. A motion for a new trial was made by the defendant and denied by the court. This appeal is from the judgment and the order denying the motion for a new trial.

The findings of the court are as follows: "1. That on the 28th day of September, 1913, and while plaintiff was riding in a buggy drawn by one horse coming easterly in that portion of 'Fifth' Street in the City of Marysville, County of Yuba, state of California, generally known as the 'subway,' defendant in and driving a motor vehicle, to wit, an automobile and going in the opposite direction,—namely, westerly, and driving his said automobile on the left side of the center of said street or road, and in the dark, at the hour of about eight o'clock P. M., of said day, negligently, wrongfully and carelessly ran into and collided with said horse and buggy throw-

ing plaintiff from the seat thereof into the back or top of said buggy which was down, overturning said buggy and throwing said top with plaintiff therein upon the ground, seriously injuring her in the head, back and divers portions of her body and because and as a result thereof she suffered and has since continuously suffered acute pains in the back, a severe injury to the lumbar region of the vertebrae, a severe shock to her nervous system resulting in a marked and up to this date continued irregularity of her menstrual periods and other divers injuries, and all thereof was caused by the said negligence and want of ordinary care of defendant aforesaid.''

The place where the accident occurred is well described in the brief of counsel for the plaintiff as follows: ''Marysville is situate on the east side of the Feather River. Yuba City, the county seat of Sutter County, on the west side of the river. The distance between the center of the two places is approximately one mile and they are connected by a bridge across the Feather River. Fifth Street in Marysville proceeds westerly to a point near the westerly line of the city, where it is crossed by the trestle of the Western Pacific Railroad, and as the street proceeds westerly it traverses what is termed a subway until it reaches the easterly end of the Feather River bridge. The trestle has four bents or passageways, the two northerly ones being for ordinary travel, the two southerly ones occupied by the tracks of the Northern Electric Railroad. The total width of the street through this subway is approximately seventy-eight feet, thirty-three feet of which is occupied by the two railroad tracks and forty-five feet by a roadway used for ordinary travel, the roadway being on the north and the railroad tracks being on the south side of the street. The railroad portion of the street is not graded between the rails, that is, the ties appear and it is seldom used in any way for ordinary travel.''

The plaintiff and one Stoker were riding in a buggy drawn by a single horse, at the time of the accident. Stoker was driving the horse and traveling in an easterly direction at the rate of about five miles an hour. He testified that as he was leaving the bridge ''and about one hundred yards on the other side, between the bridge and the trestle-work,'' he saw an automobile coming toward him, traveling in a westerly direction and on the left hand or south side of the street; that,

upon observing the machine on the wrong side, he pulled his horse toward and near the car tracks, which, as seen, are located on the south side of the street. . . . "When I first saw the machine," he proceeded, "it was about in the center of the street. It turned before it came to the trestle and when I saw it pass under I pulled toward the car track to the right hand side and the machine kept coming straight and gradually ran into me about one hundred yards the other side of the trestle next to the car track. . . . I was on the south side of the center of the street. When I saw the machine approaching, I hugged the car track as close as I could." He testified that the defendant did not blow the horn on his machine or give any other warning of his approach. He also testified that he held the reins attached to the horse with both hands. As a result of the collision, testified Stoker, the horse was injured and thrown to the ground, the witness himself hurled from the buggy and the plaintiff so violently thrown into the back of the buggy as to have sustained severe injuries, according to the physician subsequently called to attend her. That the impact was a severe one is shown by the testimony of Stoker that the buggy was facing north immediately following the collision, or at right angles to the direction in which it was going when struck. "The buggy was lying on its side," continued Stoker, "and Miss Stohlman was still in the back of the buggy."

The plaintiff's testimony supported that of Stoker in all vital particulars. She, too, testified that the defendant was traveling in a westerly direction and on the left hand or south side of the street as he approached the vehicle in which she and Stoker were riding. She further testified that Stoker was driving at a rate not in excess of about five miles an hour, and that, immediately upon observing that the automobile was on the wrong side of the street, Stoker pulled the horse toward the car tracks, that is, to the extreme right or south side of the street and was in that position on the street when the machine struck the buggy.

Of course, the defense presented testimony which squarely contradicted the testimony of the plaintiff and Stoker and which (it may be added), if accepted by the trial court, would, so it appears upon its face, be sufficient to support a finding that the defendant was, at and immediately preceding the time of the accident, driving his machine in a careful

manner and in accord with the requirements of the statute prescribing and limiting the rate of speed beyond which motor vehicles may not be driven over the public highways of the state and otherwise regulating the manner of their use on such thoroughfares. It is not necessary to present herein a statement of the testimony so submitted, for, so far as this court is concerned, it is sufficient if there be found in the record, as we have found therein, sufficient support for the findings in testimony characterized by no such inherent weakness or, upon its face, so wanting in probative force, as to warrant the conclusion that, as a matter of law, it cannot uphold the conclusions of fact upon which the judgment is planted.

It is now in order to inquire whether the court was warranted in finding from the evidence that the proximate cause of the injuries received by the plaintiff was in the negligence of the defendant in driving his machine on the wrong side of the street and so approaching and colliding with the vehicle in which the plaintiff was riding.

Section 4, subdivision 1, of an act of the legislature of 1907, amending certain sections of ''An act to regulate the operation of motor vehicles on public highways,'' etc., provides, in part, as follows: ''Whenever a person operating a motor vehicle shall meet upon a public highway any other person riding or driving a horse or horses, or other live stock, or any other vehicles, the person so operating such motor vehicle shall reasonably turn the same to the right of the center of such highway so as to pass without interference.'' (Stats. 1907, pp. 916, 917.)

The same act (sec. 3, subd. 3) provides: ''Upon approaching a person walking in the roadway of a public highway, or a horse or horses, or other live stock, being ridden, led or driven thereon, a person operating a motor vehicle shall give reasonable warning of its approach, and use every reasonable precaution to insure the safety of such person or animal, and, in the case of horses or other live stock, to prevent frightening the same.''

It is plainly evident that by the foregoing provisions of our statute law regulating the manner of using the public highways by persons operating or driving vehicles of any sort thereon, the legislature intended to make it the duty of persons so using such highways to keep to the right side thereof. In other words, we are of the opinion that, in thus prescribing

highway regulations, the legislature thereby intended to require persons so using the public highways to keep to the right of the center of such thoroughfares at all times, when possible to do so, regardless of whether they should actually meet or see any other person traveling on such highway in an opposite direction. This view of the provisions of the statute in question appears to be sustained, by the very recent case of *Raymond* v. *Hill,* 168 Cal. 473, 481, [143 Pac. 743, 746], wherein, Mr. Justice Henshaw, speaking for the court, says: ''So long continued and universal is the custom in California for approaching vehicles or pedestrians to pass to the right, and to pass to the left when the approach is made from behind another vehicle or pedestrian, that it may be said to be a part of our common law. In this state the custom, in fact, has been crystallized into statute law. (Stats. 1905, p. 816.) This law declares it the duty of the drivers of all motor vehicles to pass to the right of an approaching person or vehicle and to 'give reasonable warning of approach, and use every reasonable precaution to insure the safety of such person or animal.' (Sec. 3, subd. 3.) In the same way it is declared the duty of the driver of the motor vehicle to pass to the left on approaching any person or other vehicle from the rear. The effect of these laws, as well as the universal custom, is to prompt vehicles generally to use the right hand portion of the highway.''

But it is not to be understood that we intend to hold that the fact that the driver of a motor vehicle may violate the statute by driving on the wrong side of the road or street is itself necessarily an act of negligence in all cases. He might for a sufficient reason be compelled to drive on the left of the center of the road or street and do so in such manner as to leave to approaching vehicles, pedestrians, or animals ample opportunity to pass with perfect safety to themselves, in which case, if damage occurred by collision with his vehicle, the question as to whose negligence was directly responsible therefor would depend for its solution upon the other circumstances attending the accident. In brief and in other words, the fact that he was driving over the highway on the left of the center of the roadway might, where injury to another had resulted therefrom, constitute *prima facie* evidence of negligence, but it would amount to no more than that and its evidentiary effect might properly be overcome or dispelled by other evidence.

We can perceive no inconsistency between the rule as thus stated and the declaration in the opinion in the case of *Scragg* v. *Sallee,* 24 Cal. App. 133, [140 Pac. 706] (cited here), that one who drives a motor vehicle over a street beyond the rate of speed prescribed and limited by a municipal ordinance and for which a penalty is provided is guilty of negligence *per se.* The two propositions, as we conceive them, are widely divergent. In the one case, the drivers have the *right* to pass over public streets and highways, and, as before suggested, if they "give reasonable warning of their approach" and "use every reasonable precaution to insure the safety of" approaching vehicles, persons, or animals, the mere fact that they are traveling on the left of the center of the highway, while evidence of negligence of more or less significance, according to other circumstances of the case, is not itself negligence. In the other case, one who violates a penal statute or municipal ordinance commits a public wrong, and such act is negligence *per se,* and nothing further need be proved if it be shown that the infraction of such law or ordinance was the direct and sole cause of an injury to another.

It was, however, for the trial court, acting as a jury, to determine from the evidence whether the proximate cause of the plaintiff's injuries was in the act of the defendant in wrongfully driving his car on the south side of the street, and that its determination of that question cannot be held to be open to review by this court, must become plainly manifest upon a consideration of the evidence, of which a synoptical statement is given above.

But to briefly recapitulate: The width of the street through which the subway passes is seventy-eight feet, of which thirty-three feet are and were at the time of the accident occupied by two railroad tracks, leaving a roadway of forty-five feet for the accommodation of the usual or customary travel. The railroad portion of the street, as has been shown, was not then graded between the rails and was rarely ever used for the ordinary travel, and, indeed, was hardly in a condition for that purpose. Thus, it will be seen, the portion of the street designed for the usual travel and which was ordinarily and generally used for that purpose was of such limited width as to make it extremely unsafe for a motor-vehicle, or any other kind of vehicle for that matter, to be driven over it on the left

hand side of its center line, even under ordinary circumstances and much more so in the night-time.

The court seems clearly to have been warranted in concluding that the defendant was driving on almost the extreme left hand side of the street when the collision occurred, for both the plaintiff and Stoker testified that the latter, on noticing the approach of the automobile, immediately turned his horse toward and "hugged" the car tracks—that is, that he moved to a point as near the car tracks as possible without driving upon them. There were no obstructions in the street requiring the defendant to go out of the usual and proper course. The lamps upon his machine were lighted at the time, and even if it be true, as he testified, that those lamps did not throw the light far enough ahead of the machine to discover to his view the approach of the buggy in which the plaintiff was riding, they certainly reflected sufficient light to enable him readily to discern with at least approximate accuracy the center line of the street. Indeed, being a resident of Marysville and engaged in the real estate business therein, it is fair to presume that he was familiar with the general condition of that portion of Fifth Street, and that he must have known the width of the street and the existence of the car tracks thereon. Of course, it was his duty, in passing through the subway and over the street, to exercise that degree of care which was commensurate with or reasonably exacted by the conditions therein existing and of which conditions he had knowledge. He failed to do this, according to the evidence from which the findings were manifestly educed.

His statement, even assuming it to have been believed to be true by the trial court, that, because of the darkness in the subway and in that portion of the street, he could not and did not see the buggy or know that it was approaching, does not constitute a sufficient or legal reason for his carelessness in driving on the left hand side of the street and cannot, therefore, stand as a ground for absolving him from responsibility and liability for the consequences of his wrongful act. Indeed, the very fact that it was so dark that it was impossible for one to see a vehicle unequipped with lights even a short distance ahead of him called for the exercise of much more than ordinary care by one driving an automobile over the street; and in this case the fact that the night was as dark as described by the defendant is a circumstance in aggravation

rather than in mitigation of his omission to take the proper side of the thoroughfare upon leaving or passing through the subway.

Thus we have reviewed and commented upon the evidence and the natural and logical effect thereof, not upon the assumption that it is a function of a reviewing court to determine whether the plaintiff has established the issue submitted and maintained by her by the degree of proof entitling her to prevail, but for the single and the legitimate purpose of showing that the trial court's findings seem to have been justified, or, at any rate, are sufficiently supported.

It is next contended that the court's order allowing the plaintiff to amend her complaint in certain particulars during the progress of the trial and before she rested her case was erroneous and detrimental to the rights of the defendant. The original complaint alleged that, by reason of the injuries sustained by her, the plaintiff was compelled to incur a doctor's bill for fifty dollars and that she suffered damage, measured in money, in the sum of two thousand dollars. By the amendments, the complaint was made to allege that the doctor's bill amounted to one hundred and fifty dollars and the damage sustained to the plaintiff to the sum of five thousand dollars.

Counsel for the defendant objected to the allowance of the proposed amendments, and the ground of their objection appears to have been that the changes which it was proposed to make in the complaint involved matters arising subsequently to the filing of the original complaint and that, therefore, they should have been introduced as issues in the case by way of a supplemental complaint (Code Civ. Proc., sec. 464), copy of the same served on the defendant and the latter given ten days' time within which to interpose an answer thereto. Viewing the proposed amendments in this light, counsel, upon the order being made allowing them, objected to proceeding further with the trial of the case at that time.

Very clearly, the changes made in the complaint under the order complained of involved the introduction of no matter or facts arising *after* the filing of that pleading in its original draft. The cause of action stated in the complaint consisted of the injuries suffered by the plaintiff through the negligence of the defendant, and the alteration of the complaint in the indicated particulars introduced therein no new element, but

merely had the effect of calling for a larger *quantum* of compensatory relief for the cause of action as it was originally stated than was claimed and demanded in the first instance. It is in no respects any different from a case where, the action being upon a *quantum valebat,* the amount originally sued for and alleged to be the reasonable value of the goods was less than the proofs disclosed them to be reasonably worth. In such case no one would say that the alteration of the complaint so that in that particular it would conform to the evidence would involve the introduction of facts arising after the filing of the original complaint.

We cannot say that the court was not warranted in allowing the complaint to be amended in the particulars mentioned. Of course, it is a well-established and no uncommon practice to order pleadings to be so amended as to conform to the proofs during the trial of the cause and even after the trial. (Code Civ. Proc., sec. 432; *Daly* v. *Ruddell,* 137 Cal. 671, 676, [70 Pac. 784].) There was evidence which showed that, instead of fifty dollars, which was the amount originally alleged to have been paid out for medical services, the sum of one hundred and fifty dollars constituted the amount actually expended by the plaintiff for such services. As to the amendment whereby the amount of the actual damages claimed by the plaintiff was increased from two thousand dollars to five thousand dollars, it is plainly apparent that the defendant was not prejudiced thereby, even if the allowance of said amendment might be said to involve error, for the amount of the damages awarded by the court was far below the sum prayed for in the complaint as it was originally filed.

No other questions are submitted here for consideration.

The judgment and the order are affirmed.

Chipman, P. J., and Ellison, J., *pro tem.,* concurred.